NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

———————————————————
                                    :
ROBERT F. GIORDANO, JR.,            :
                                    :
            Petitioner,             :        Civil Action No. 12-0617 (PGS)
                                    :
       v.                           :        **O P I N I O N**
                                    :
CHARLES E. WARREN et al.,           :
                                    :
            Respondents.            :
———————————————————:

SHERIDAN, U.S.D.J.

Petitioner Robert F. Giordano, Jr. ("Petitioner") filed a Petition for a Writ of Habeas

Corpus, pursuant to 28 U.S.C. § 2254(a), challenging a judgment of conviction entered by the

Superior Court of New Jersey.  See Docket Entry No. 1.  This Court advised Petitioner of his

rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and ordered Respondents to file a

limited answer as to timeliness/exhaustion.  See Docket Entries Nos. 2 to 8 (The Court's orders

and the parties' replies).  The Court then directed an answer on merits; Respondents duly

complied and Petitioner traversed.  See Docket Entries Nos. 9-11.  For the reasons expressed

below, the Court will dismiss the Petition and decline to issue a certificate of appealability.  See

28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

I.      **BACKGROUND**

While Petitioner's claims are not complex, the factual predicate underlying his challenges

is dense.  The Court, therefore, finds it warranted to carefully detail the record presented to and

ruled upon by the state courts.  Accord Cullen v. Pinholster, 131 S. Ct. 1388 (2011).

The victim of Petitioner's crime was his girlfriend, Jodi Migliara ("Jodi").  The evidence presented established that, until she met Petitioner in early January 1999, she had an outgoing and friendly personality, kept close contact with her mother and friends, and enjoyed her employ. She had a condominium where she rented a bedroom to a certain Heidi Dotzenrod ("Heidi"). Jodi's personality and habits swiftly changed after she met Petitioner: her morning calls to her mother switched from regular to rare and, five weeks later, stopped, and she began severing contacts with her friends explaining that Petitioner, a divorced man with many prior intimate relationships, was monitoring her whereabouts and emails, and demanded her constant company.

On March 7, 1999, Petitioner moved into Jodi's condominium.  Later on that day, Heidi saw him and Jodi go out; they returned at 6:00 p.m. walking into Jodi's bedroom and closing the door.  Next morning, Heidi left for work at about 6:45 a.m. noting that Jodi's alarm did not ring (even though Jody was usually waking up at that time), and neither Jodi nor Petitioner came out Jodi's bedroom; both Jodi and Petitioner's cars were parked outside.

Later that morning, Jodi called her supervisor, saying she was too sick to go to work; she sounded "very distraught" and exhausted, as if after a sleepless night.  Jodi also left messages for two other colleagues in the same distraught, exhausted voice asking to contact her back by the company messaging system rather than on her phone.  Petitioner also did not go to his office; in fact, he did not even call his office and did not respond to his colleagues' repeated calls and paging.  He, however, called his parents and brother-in-law, and withdrew cash from an ATM.

Later that day, Heidi came back from work and, shortly thereafter, left for a gym noting that Jodi's bedroom door remained closed, and Jodi and Petitioner's cars were still parked outside.  Heidi returned from the gym at 8:00 p.m. and, by the time she was going to sleep, she

2

noticed that Jodi's bedroom door was still closed.  Heidi woke up in the middle of the night hearing the door to the condominium closing.

Next morning, that is, on March 9, 1999, she noticed, again, that Jodi's alarm did not ring.  That same morning, Petitioner went to a certain church and asked to speak to a priest. However, being told where he could find the priest, Petitioner left going to a police station. There, he saw two officers, whom he asked, "Did my mother call about my girlfriend?"  One of the officers responded that he knew of no such call, while the other was startled by the scratches on Petitioner's face.  Petitioner then told the officers that he had a "fight" with his girlfriend, that she was in the woods and might already be not breathing.  The officers took Petitioner placed him in custody; during the process, they noticed cuts and dried blood on his wrists.

Police forces was sent into the woods to look for Jodi.  Her body, badly bruised, was found near the place where Petitioner lived as a child; the body was partially covered with a black coat.  Jodi was lying on her back, with leaves, sticks, twigs and debris in her hair, face and left hand; her arms, covered with contusions and abrasions, were stretched out as if she was dragged face down by her feet; her sweater was rolled up around her neck and dragging injuries were covering her face, head, lower chest and upper stomach.  The officers who found her were shocked by this "totally mutilated" body; she was pronounced dead on the scene.

The local medical examiner's office performed her autopsy and determined that the post-mortal stiffening (which usually occurs within a few hours after death) did not take place until after Jodi had been taken to the woods.  The multitude of her massive and minor injuries were catalogued, including a three-and-one-half-inch bruise covering her right eyeball ruptured by a "blowout" to the globe of her eye, a three-quarter-inch tear where her skin was torn off her flesh,

3

her forehead peppered with injuries and abrasions, her broken nose bone and a one-inch bruise right under it, her bruised jaw and bruised lips that had lacerations, the scores of contusions and abrasions on her cheek, chin, ear, etc.[1]  Her neck too was covered with multiple contusions the pattern of which suggested pressure applied by a sweater or necklace, or the knuckles of an adult fist; some contusions were four-inch long, running from the neck to below the ear; her wrist had a ligature indicating bondage.

In addition, the autopsy disclosed severe internal injuries, including extensive under-scalp and brain hemorrhages, and a multitude of neck bone injuries and hemorrhages.  These injuries indicated a patter of separate strangulations. The final cause of Jodi's death was, thus, deemed to be strangulation, although her two fractured ribs, that punctured Jodi's liver and resulted in extensive abdominal bleeding, contributed to her death.  In fact, the massive hemorrhage of her liver was such that it suggested the blow that caused the ribs fracture and liver injury might have taken place almost two days prior to Jodi's death.  Petitioner admitted that Jodi spent the last two days of her life exclusively in his company.

In light of this evidence, the State maintained that Petitioner was battering Jodi over an extensive period of time; therefore, her death could not have been a result of Petitioner injuring her due to losing control for a brief moment.   Petitioner, however, maintained that Jodi's death occurred because, for a moment, he just "lost it" and "hit" her.  He claimed that, when he and Jodi were driving  by a country club where they were fancying to have a wedding celebration, Jodi suddenly left the car upon becoming angry in response to Petitioner's comment that the

---

[1]  In addition, a circular burn-like mark was noted on her face; the size and shape of the mark suggested it was probably a cigarette burn.

4

wedding might be best postponed, causing Petitioner to exit the car and follow her until, in the midst of the argument, she kneed him in the groin and, in the spur of the moment, he hit her and, to his shock, killed her.  He claimed he could not specifically recall strangling Jodi, but he stated that he, indeed, might have "grabbed" her neck.

On the basis of his theory of the case, Petitioner maintained that he committed a passion/ provocation manslaughter that took place during an about a thirty-second interval rather than a knowing/purposeful murder that was perpetrated over a long period of time.[2]  After an eleven-day trial, the jurors agreed with the State's position that the totality of evidence supported a murder conviction.  Petitioner was, thus, sentenced accordingly.  He appealed, and the Superior Court of New Jersey, Appellate Division ("Appellate Division"), affirmed his conviction and sentence.  The Supreme Court of New Jersey denied certification.  See State v. Giordano, 185 N.J. 387 (2005).  He filed a timely application seeking post-conviction relief ("PCR"), raising a slew of counseled and pro se challenges.  The Superior Court of New Jersey, Law Division ("Law Division"), held a hearing and denied his application.  The Appellate Division affirmed. See State v. Giordano, 2010 WL 3932409 (N.J. Super. Ct. App. Div. Oct. 6, 2010).  The Supreme Court of New Jersey also denied certification as to his PCR challenges.  See State v. Giordano, 205 N.J. 101 (2010).  The Petition within followed.

## II.    PETITIONER'S CHALLENGES AT BAR

Petitioner's challenges, originally asserted in his Petition, Docket Entry No. 1, were reiterated in his letter, Docket Entry No. 6.  His Ground One asserted that his counsel violated his

---

[2]  Petitioner's apartment and vehicle were examined; Jodi's purse was found in Petitioner's apartment, and his car evinced interior damage, including dents in the roof, a severed rear view mirror and a cracked windshield.

Sixth Amendment rights by not raising a "diminished capacity defense."  Docket Entry No. 6., at 1.  His Ground Two, being an "umbrella" challenge, raised multiple claims based on the events that took place during the jury deliberations.  See id. at 2.  The analogously "umbrella"-structured Ground Three alleged, in a somewhat cryptic fashion, multiple claims which Petitioner summarized into an assertion that his "right to remain silent" was violated.  See id.  Finally, in his Ground Four, Petitioner challenged admission of an expert opinion that the circular mark on Jodi's face was probably a cigarette burn.  See id.  Respondents maintain that Petitioner's Grounds Two to Four, inclusive, were procedurally defaulted and, in addition, that all Petitioner's Grounds fail on their merits.  See Docket Entry No. 10.

III.    STANDARD OF REVIEW

The general standard of federal habeas review is long-established, and it sets forth a narrowly-tailored test.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner").

Thus, Section 2254(a) permits a federal court to entertain only claims alleging that a person is held in state custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The AEDPA further limits a federal court's authority to grant habeas relief by providing that, when a state court has adjudicated a petitioner's federal claim on the merits, a district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Parker v. Matthews, 132 S. Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).[3]

## IV.    PROCEDURAL DEFAULT ASPECT

Respondents maintain that Petitioner Grounds Two to Four, inclusive, are procedurally defaulted because Respondents believe that Petitioner did not raise these challenges in the state forum and, in addition, Petitioner would be unable to raise these challenges now under the state period of limitations governing PCR proceedings.  Respondents err in both facts and law.

The doctrine of procedural default is merely an outgrowth of the exhaustion requirement. A habeas petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims either on direct appeal or in post-conviction proceedings.  See Ross v. Petsock, 868 F.2d 639 (3d Cir. 1989); see also O'Sullivan v. Boerckel, 526 U.S. 838 (1999).  The claims heard by the state courts must be the "substantial

---

[3] Consequently, the starting point of federal habeas review under § 2254(d)(1) analysis is to determine the relevant law clearly established by the Supreme Court.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). A decision is "contrary to" a Supreme Court holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a) the state court outright "contradicts the governing law set forth in [the Supreme Court] cases"; or (b) the state court "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  Williams, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  Notably, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law."  Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410).  Correspondingly, the standard posed by federal habeas review "is a difficult to meet, [since it is a] highly deferential standard for evaluating state-court rulings, [and that standard] demands that state-court decisions be given the benefit of the doubt."  Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted).February 28, 2013

equivalent" of the claims asserted in the federal habeas petition.  See Picard v. Connor, 404 U.S. 270, 275 (1971).

Correspondingly, district courts are obligated to dismiss habeas petitions containing unexhausted claims, even if it is not likely that a state court will consider the claims on the merits.  See Rose v. Lundy, 455 U.S. 509, 522 (1982); Banks v. Horn, 126 F.3d 206, 212-14 (3d Cir. 1997); see also Toulson v. Beyer, 987 F.2d 984, 989 (3d Cir. 1993).  However, a different analysis applies to those petitions that consist of (or include within themselves) unexhausted challenges with regard to which it is certain that the petitioner cannot obtain state court review, since Section 2254(b)(1)(B)(i) excuses exhaustion where there is "an absence of available State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i); see also Duckworth v. Serrano, 454 U.S. 1, 3 (1981) (per curiam).  Thus, a petition containing claims that are unexhausted but "procedurally barred" cannot be dismissed for failure to exhaust.[4]  See Toulson, 987 F.2d at 987; accord Coleman v. Thompson, 501 U.S. 722, 730-32 & n.1 (1991); Harris v. Reed, 489 U.S. 255 (1989). That being said, the procedural default analysis is not triggered until and unless the state court review is actually "unavailable" under § 2254(b)(1)(B) and (c).[5]  In determining whether state

---

[4]  While procedural default excuses exhaustion, it is a double-edged sword, i.e., the doctrine was not created as an incentive for state litigants to circumvent state court review: even when petitioner's failure to comply with a state procedural rule has actually prevented the state courts from reaching the merits of his federal claims, federal habeas review of those claims is ordinarily barred, see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991), "unless the habeas petitioner can show 'cause' for the default and 'prejudice' attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." Harris, 489 U.S. at 262 (citations and internal quotation marks omitted); accord Coleman, 501 U.S. at 750; Cabrera v. Barbo, 175 F.3d 307, 312-14 (3d Cir. 1999); McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999).

[5]  While New Jersey Court Rule 3:22-12, poses a five-year limitation period for the filing
(continued...)

court review is "available," the federal courts "turn [their] attention to the actuality that the state courts would refuse to entertain" the petitioner's federal claims. Lambert, 134 F.3d at 516; Christy, 115 F.3d at 207. Only where the claim is not addressed on merits, e.g., in conjunction with or in alternative to notice of procedural deficiency and, in addition, "a state court decision exists indicating that a habeas petitioner is clearly precluded from state court [review on merits], the federal habeas claim" could be deemed procedurally defaulted in federal habeas review. Lambert, 134 F.3d at 517. In light of the foregoing, once the state courts addressed a certain claim on merits, a "substantial equivalent" of that claim cannot be deemed *either unexhausted or procedurally defaulted* for the purposes of a Section 2254 action, regardless of whether such state review on merits was performed on direct appeal or by means of a PCR proceeding. Accord Coleman, 501 U.S. at 732. Moreover, a state court may render an adjudication on the merits of a federal claim by rejecting the claim *without any discussion whatsoever*.[6] Here, the bulk of Petitioner's claims were addressed, on merits, either on direct appeal and/or during PCR proceedings (in conjunction with the trial court observation that Petitioner's PCR challenges presented a mere reiteration or paraphrasing of his direct appellate challenges, with negligible amount of finer wrinkles left wholly unaddressed on the merits and noted solely as procedurally barred. Thus, Petitioner's claims will be deemed exhausted for the purposes of this review.

---

[5](...continued)
of PCR applications, this requirement is subject to relaxation, where appropriate. See State v. Preciose, 129 N.J. 451, 454 (1992); State v. Mitchell, 126 N.J. 565 (1992); State v. Johns, 111 N.J. Super 574, 576 (N.J. Super. Ct. App. Div. 1970).

[6] See Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004), rev'd on other grounds sub nom, Rompilla v. Beard, 545 U.S. 374 (2005); see also Jenkins v. Superintendent of Laurel Highlands, __ F.3d __, 2013 U.S. App. LEXIS 1004, at *10 (3d Cir. Pa. Jan. 15, 2013).

V.    **DISCUSSION**

A.    **Ground One**

[During] his PCR petition, [Petitioner] asserted that "[at the time preceding Jodi's death, he] had been using a drug called Ephedrine, consuming approximately 100 pills per week."  [Petitioner] stated that he [had] informed his attorney about his drug usage, and that his attorney had [initially] "sent an investigator to a health food store to confirm [Petitioner's] continued purchases of Ephedrine leading up to the incident to support a diminished capacity defense."  [Petitioner also] presented [a] report [prepared by] Dr. Daniel P. Greenfield, a psychiatrist, who opined that such a defense was available based upon [Petitioner's] "underlying mental state and  psychiatric/neuropsychiatric/addiction medicine condition during the period of time in question."  Dr. Greenfield further opined that these afflictions "indicated that [Petitioner] was not acting in a knowing or purposeful, or intentional way in having the specific idea in mind to kill Jodi."  [Petitioner's] trial counsel [however, elected] not [to] pursue a diminished capacity defense at trial, and did not proffer an expert to support [that particular] defense[,] . . . instead [the counsel] advanced a passion/provocation manslaughter theory [confirming to Petitioner's version of the events preceding Jodi's death].

Giordano, 2010 WL 3932409, at *8.

The defense counsel's election was a result of what unfolded when Petitioner's criminal proceeding entered into its pre-trial motion practice phase.  Specifically, less than ten month after Petitioner was indicted, the State moved for admission of testimonial evidence as to Petitioner's prior acts directly relevant to Jodi's death.   See id. at *9.  These acts would be testified to by two Petitioner's former girlfriends and his ex-wife who averred that, much like he did with Jodi, Petitioner was closely monitoring their every step, caused them to sever personal and social contacts, threatened to kill them and, paramount here, systemically engaged in severe physical abuse, including the acts of striking and choking.  See id.  This evidence was so massive and devastating to Petitioner's case that his defense counsel invested inordinate efforts into seeking suppression of these facts.  See id.  To Petitioner's great advantage, the defense counsel's efforts

proved successful first at the Law Division level and, later, before the Appellate Division, where the defense counsel impressively won an appellate hearing arguing that "this [testimonial] evidence is that damning, it is that damaging," and the prejudicial effect of such testimony would be "so overpowering" that, "once it gets in, the jury [would necessarily] convicts [Petitioner simply out of their emotional belief that] he is a bad guy [who must be convicted] no matter what the Court sai[s], no matter what the instruction is."[7]  Id. at *9-10.

However, the very same testimonial evidence lied at the heart of Dr. Greenfield's report, since: (a) the report relied on Petitioner's abusive relationship with one of these girlfriends; and, had the report been admitted, (b) Dr. Greenfield would have been cross-examined about that relationship and, in addition, the State would have develop a basis to proffer its own expert detailing Petitioner's abuse of the other girlfriend and ex-wife.  See id. at *10.[8]  Weighing the long-shot benefit of raising the Ephedrine issue against the devastating costs of opening the door to Petitioner's damning past, the defense counsel made the above-noted strategic election not to risk introduction of highly prejudicial evidence.  See id.

_____

[7]  Recognizing the importance of this testimonial evidence to its case, the State unsuccessfully sought certification from the Supreme Court of New Jersey challenging the Appellate Division's affirmance of the favorable-to-Petitioner suppression ruling.

[8]  In State v. Cheever, 295 Kan. 229 (2012), the Supreme Court of Kansas pointed out that, since voluntary intoxication, which the defendant did raise as a defense, could not qualify as a mental disease or defect, the trial court's decision allowing the State's psychiatric expert to testify (on the basis of his court-ordered mental examination of the capital defendant) constituted unconstitutionally compelled self-incrimination of that defendant, since the defendant had not waived his Fifth Amendment privilege and did not testify.  The Supreme Court of the United States called this finding into question by granting certiorari.  See Kansas v. Cheever, 2013 U.S. LEXIS 1717 (Feb. 25, 2013).  Here, Petitioner waived his Fifth Amendment privilege and testified in his defense.  Therefore, it is certain that the State's expert testimony about his systemic, over-many-years abuse of women would be admitted had Petitioner opened the door.

When, during his PCR hearing, Petitioner "contend[ed] that his attorney was deficient by neglecting to have an expert 'appraise his mental condition and the effect of his Ephedrine abuse on his mental state," the Law Division found the defense counsel's strategic choice well within the safeguards of the Sixth Amendment, and the Appellate Division agreed.  See id. at *8-10. ("Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront. A trial attorney must consider what testimony a witness can be expected to give, . . . and a variety of other tangible and intangible factors") (citations to state law holding admissible evidence of defendant's domestic abuse of other women to rebut a diminished capacity claim at a murder trial, as well as other state law citations, omitted).

In addition, the Appellate Division reflected on the invalidity of the forfeited defense:

> Dr. Greenfield's report does not support a diminished capacity defense [under the state law].  The defense does not apply where a defendant's behavior was caused by an intoxicant, rather than an underlying mental [incapacity].  See State v. Reyes, 140 N.J. 344, 365 (1995).  In Reyes, the [New Jersey Supreme] Court held that the defendant could not establish a diminished capacity defense where he "had been impaired because of [his] voluntary ingestion of intoxicants," but otherwise did not suffer from an underlying mental disorder [even though the defendant] might have been suffering from depression, and that the intoxicants "had the effect of making [him] even less able to control his violent emotions." [Here,] Dr. Greenfield diagnosed [Petitioner with] dysthymia, which is [a] mild depression. . . . [Moreover,] Dr. Greenfield did not relate [Petitioner's] conduct [against Jodi] to his mild depression . . . [rather, Dr. Grienfield related it solely] to [Petitioner's voluntary intoxication with] Ephedrine . . . .  Accordingly, [the] medical evidence . . . would [not have lent] support a diminished capacity defense.  Therefore, [Petitioner] has failed to demonstrate prejudice.

Id. at *11.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective

assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.[9]  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.[10]  See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the

_____

[9]  See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

[10]  Cf. Kates v. Moore, 2009 U.S. Dist. LEXIS 77000, at *89 (D.N.J. Aug. 27, 2009) ("it is entirely proper [for the court sitting in habeas review] to engage in record-based speculation as to what counsel's strategy might have been" for the purposes of examining the "petitioner's attempt to disprove the existence of a possible sound strategy") (quoting Thomas v. Varner, 428 F.3d at 500 n.8).

entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[11]

Here, the state courts correctly concluded that Plaintiff failed to meet both prongs of the Strickland test. Petitioner's counsel made a valid strategic election to: (a) forego a legally–invalid diminished capacity defense based on Petitioner's voluntary consumption of Ephedrine; and (b) protect the crucial-to-defense advantages hard won during the suppression motion practice.  That strategic election was well within the boundaries envisioned by the first prong of Strickland.  See id, 466 U.S. at 689; Thomas, 428 F. 3d at 499.  Analogously, Petitioner suffered no prejudice within the meaning of the second prong of Strickland, since his involuntary intoxication with Ephedrine, even if established, would aid him none being not be cognizable under the state law. Correspondingly, his jurors would not have reached a different factual finding.  See Strickland, 466 U.S. at 695-96.  In light of the foregoing, the state courts' decisions denying Petitioner's Ground One challenges were not an unreasonable application of Supreme Court precedent.

**B.**     **Grounds Two and Three**

In his Ground Two, Petitioner first asserts that, during the jury deliberation process: (a) the jury requested a definition of a "third degree felony" (since Petitioner previously pled guilty

---

[11]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

to such offense); (b) the trial judge responded by giving the definition and the sentencing ranges for the first-, second- and third-degree offenses, and declared a lunch break; (c) during the break, Petitioner's counsel uttered a concern that the jurors could unduly aim for a murder conviction out of a belief that a manslaughter conviction would expose Petitioner only to a very short prison term; and, thus, right after the break, (d) the trial judge gave the jurors a limiting instruction.

Since the limiting instruction was given to the jurors an hour and fifteen minutes after they were informed of the sentencing ranges for the first-, second- and third-degree offenses, Petitioner maintains he was denied fair trial. See Docket Entry No. 1, at 11-12. However, in Greer v. Miller, 483 U.S. 756, 766 n.8 (1987), the Supreme Court pointed out that the courts normally presume that a jury would follow a limiting instruction unless the litigant shows an "overwhelming probability" that the jury was unable to follow the court's limiting instruction.[12] Here, if this Court were to presume that the trial court's statement to the jurors about the sentencing ranges was an error,[13] Petitioner's position that the lunch break made the jury unable to follow the limiting instruction is without merit: such lunch break establishes neither a "great

---

[12] Elaborating on the same, the dissenting decision in Richardson v. Marsh, 481 U.S. 200, 208 (1987), relied on Bruton v. United States, 391 U.S. 123, 136 (1968), in order to point out that a criminal defendant's rights are not violated unless there is a showing of a strong likelihood that the effect of the introduction of inadmissible or irrelevant information would be "devastating" to the defendant. The majority in Bruton opined that limiting instructions are deemed insufficient if "there is [merely] a great risk that the jury will not or cannot follow those instructions." Holland v. Attorney Gen. of New Jersey, 777 F.2d 150, 155 (3d Cir. 1985).

[13] In Shannon v. United States, 512 U.S. 573, 579, 586-87 (1994), the Supreme Court admonished that courts should withhold information about punishment from the jury because the jury's role is typically restricted to deciding whether the defendant is guilty of the crime charged.

risk" nor an "overwhelming probability" that the jurors ignored that instruction.[14] Thus, dismissal of Petitioner's challenges based on the lunch-break delay in administering the instruction was not an unreasonable application of Supreme Court precedent.

The remaining challenges of Ground Two focus on the trial court's dismissal of a pregnant empaneled juror who became physically unwell during the deliberation process and was substituted by one of the alternative jurors.   Specifically, after the pregnant juror informed the trial court that she was not feeling well, she was first interviewed in chambers and then dismissed in open court, in the presence of Petitioner's counsel while Petitioner was in his cell.  During these events, the remaining eleven jurors continued deliberating among themselves; that deliberation continued for about 25 minutes until the trial judge directed them to suspend deliberations until an alternative is selected.  All alternatives, being re-voir dired, admitted discussing the case among themselves but verified that none of them reached a conclusion as to Petitioner's guilt or innocence.  Petitioner maintains that these developments violated his right to presence and deprived him of a fair trial by an impartial jury.

However, the litigant who "did not object to [his] exclusion from in-chambers conferences at any time in the proceeding . . . waived their right to be present at the in-chambers voir dire." United States v. Johnson, 677 F.3d 138, a42 (quoting United States v. McClendon, 782 F.2d 785, 788-89 (9th Cir. 1986) , and citing the United States v. Gagnon, 470 U.S. 522 (1985), jurisprudence).  Here, neither Petitioner nor his counsel objected to the trial court's in-chambers communication between the trial court and sick juror either during that communication

_____

[14]   Analogously, Petitioner failed to show a strong likelihood that the information about the sentencing ranges had a "devastating" effect on Petitioner's defense.

*or at any point thereafter*.  In addition, Petitioner's counsel was in the courtroom when the juror was dismissed.

Moreover, in the event Petitioner implies that the dismissed juror was biased against Petitioner, the juror's removal and her lack of participation could not form a basis for Petitioner's habeas challenges.  See Williams v. Ricci, 2012 U.S. Dist. LEXIS 177857 (D.N.J. Dec. 14, 2012) (extensively discussing the same).  Alternatively, to the extent Petitioner speculates that the dismissed juror was favoring his cause, Petitioner: (a) neither offered any evidence to that effect; nor, paramount here, (b) offered this Court with any legal basis indicating that Petitioner was entitled to force that juror to remain on the panel.  The record of the juror's dismissal raises no constitutional concerns since she was dismissed on the basis of her health issues wholly unrelated to the merits of Petitioner's case.  See Docket Entry No. 10-20, at 29 (reflecting both counsels' consensus that the pregnant juror had to be excused on the basis of her health issue); compare United States v. Symington, 195 F.3d 1080, 1083 (9th Cir.1999) (a court may not dismiss a juror "if the record discloses any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case").[15]

Analogously, while Petitioner was indeed entitled to an impartial jury, see Smith v. Phillips, 455 U.S. 209, 217 (1982); Sheppard v. Maxwell, 384 U.S. 333, 351 (1966), the fact that the alternative jurors admitted discussing the case among themselves did not render the selected alternative juror unduly partial, since each alternative juror verified not reaching a conclusion as

---

[15]  With the same token, the fact that the remaining eleven jurors continued deliberating during the 25-minute period when the sick juror was undergoing the dismissal process raised no constitutional concerns: had it been otherwise, jury deliberation would have to stop each time a juror needs to take a bathroom break.

to Petitioner's guilt and, thus: (a) the non-selected alternative jurors could tainted the judgment of the selected one; and (b) the statements made by the selected juror verified their impartiality.[16] Accord Patton v. Yount, 467 U.S. 1025 (1984) (the jury, as a whole, was impartial where the totality of the voir dire record failed to reveal that the jury, empaneled as a whole, was unable to provide the defendant with a fair trial, regardless of the minor ambiguity in the testimonies of a few jurors).   Correspondingly, dismissal of Petitioner's Ground Two challenges was not an unreasonable application of Supreme Court precedent.

Petitioner's Ground Three asserts that his right to remain silent was violated by the prosecutor of his case.  See Docket Entry No 1, at 14.  In support of that assertion, Petitioner clarifies that: (a) upon being placed in custody by the police officers (whom he informed that he had a fight with Jodi, and she was in the woods and not breathing), he was duly given his Miranda rights and elected not to talk to the police officers without counsel present; (b) later that day, he was treated by a jail nurse for the scratches on his face; and (c) at trial, the prosecutor crossed-examined Petitioner asked him, inter alia, why Petitioner neither inquired with the police about Jodi's condition after she was found, nor clarified to the nurse how he developed the scratches on his face.[17]  See id. at 15.

---

[16]  See Docket Entry No. 10-20, at 30 (reflecting the statements by all alternative jurors that no discussion of deliberation or verdict took place).  Moreover, the trial judge directed the reconstrcted jury to start the deliberation process "anew" and to "set aside and disregard all of [the jurors'] past deliberations and begin [their] deliberations again just as if [the jury, in its new composition, was] now entering the jury room for the first time directly after listening to [the trial court's] charge."  Id. at 29-30.  Moreover, the trial judge instructed the eleven jurors remaining from the original panel to "eliminate [from their minds] any impact that [the dismissed juror] may have had on the deliberations."  Id. at 30.

[17]  The prosecutor's summation also referred to Petitioner's lack of interest in Jodi's

(continued...)

The prosecutor's line of questions related to the nurse yielded the defense counsel's objections and request for limiting instructions (which was denied).  See id.  On these bases, Petitioner maintains that his right to "remain silent" was violated.

Petitioner mis-characterizes his own claim.  Since he elected to testify on his own behalf, his Fifth Amendment right not to take the stand is of no relevance.  Analogously, since Petitioner made no custodial statements (and no such statements could have been offered into evidence by the State), the protection against self-incrimination was not implicated.  Rather, Petitioner's challenges present attacks on: (a) the prosecutorial questioning and summation; and (b) the trial court election not to offer limiting instructions.

In Darden v. Wainwright, 477 U.S. 168, 181(1986), the Supreme Court articulated the test applicable to the claims asserting prosecutorial misconduct.  The Court held that "the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Id. at 180 (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  This analysis applies to prosecutorial opening statements and summations as well as to the questions asked by prosecutors.  The quantum or weight of the evidence is crucial to determining whether the prosecutor's statements before the jury were so prejudicial as to result in a denial of due process.  See Darden, 477 U.S. at 182; Donnelly, 416 U.S. at 644; Moore v. Morton, 255 F.3d 95, 111 (3d Cir. 2001).[18]

---

[17](...continued)
condition and his election not to disclose the origin of his injuries to the nurse who treated them.

[18]  In Griffin v. California, 380 U.S. 609 (1965), the Supreme Court ruled that a prosecutor may not comment on a defendant's election not to testify since such a comment would violate the defendant's Fifth Amendment right against self-incrimination.  See also Baxter v.

(continued...)

Here, the fact that Petitioner had scratches on his face was well established, as was the fact that Jodi's body was "totally mutilated."  While the prosecutorial questions and summation comments (about Petitioner's lack of interest in Jodi's condition and about Petitioner's medically odd election not to disclose the origin of his injuries to the nurse who treated those injuries) would be best left out, these comments and questions were not so prejudicial as to result in a denial of due process, especially if these questions/comments are assessed: (a) in comparison with the massive body of inculpatory evidence proffered by the State; and (b) the relevant jury instructions given by the trial court.  See Docket Entry No. 10-20, at ("The arguments, the statements, remarks, the closing arguments of the attorneys are not evidence and must not be treated as evidence.  Although [during the course of the trial,] the attorneys may point out what they think are the important and salient facts of the case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the course of the trial").

---

[18](...continued)

Palmigiano, 425 U.S. 308, 318 (1976) ("Griffin prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt"); accord Marshall v. Hendricks, 307 F.3d 36, 70 n.24 (3d Cir. 2002) (relying on New Jersey law and Donnelly, 416 U.S. at 643, for the observation that a prosecutor's statement suggesting that a defendant's act of retention of counsel is inconsistent with the defendant's innocence impermissibly infringes on the defendant's constitutional right to counsel since, at the heart of Donnely, lies the preservation of the "benefit of . . . specific provision[s] of the Bill of Rights, such as the right to counsel."  In contrast, the Bill of Rights is not implicated by a defendant's inquiries about the condition of his victim or by a statement to a medical practitioner.  See Estelle v. Smith, 451 U.S. 454, 470 (1981) (a defendant's statement to a psychiatrist was deemed a compelled interview warranting habeas relief since the interview was not accompanied by a separate Miranda warning); see also State v. Chew, 150 N.J. 30, 64 (1997) (a defendant's inquiries about what would happen to him are incidental to the custodial relationship and should not be deemed as initiating further interrogation), certif. denied 528 U.S. 1052 (1999), abrogated on other grounds State v. Boretsky, 186 N.J. 271 (2006) (rejecting the claim that a defendant's equivocal statement about "counsel," made during an emergency aid situation and before Miranda warning was administered, was an invocation of the Miranda right to counsel but, notably, deducing no waiver from the defendant's inquiries about his victim's condition).

Petitioner opines that the above-quoted instructions were insufficient, and additional limiting instructions were necessary.  Generally, a jury instruction (or a lack thereof) does not warrant federal habeas relief unless the petitioner "point[s] to a *federal* requirement that jury instructions . . . must include particular provisions" or demonstrates that the jury "instructions {as given, and without more,] deprived him of a defense which federal law provided to him." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997) (emphasis supplied); see also Henderson v. Kibbe, 431 U.S. 145, 155 (1977) ("An omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law").

> [T]he only question for [federal courts sitting in habeas review] is "whether the ailing instruction [as given, and without more,] so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.

Estelle v. McGuire, 502 U.S. at 72-73.

Here, the instructions provided by the trial court were sufficient, and the lack of an additional instruction (directing the jury to ignore the prosecutorial questions, which bore no fruit) and prosecutorial comments did not deprive Petitioner of any defense that federal law allowed him.  Thus, dismissal of Petitioner's Ground Three was not an unreasonable application of Supreme Court precedent.

### C.    Ground Four Merits No Relief

Finally, in his Ground Four, Petitioner asserts that one of the four expert testimonies proffered by the State violated his rights. See Docket Entry No. 1, at 16-18.  Petitioner maintains that three of the State experts testified, inter alia, that a circular mark on Jodi's face was of a non-specific origin, and the same testimony was offered by Petitioner's expert, but one State's expert,

who later became incapacitated, testified by concluding, <u>inter alia</u>, that the mark was, "possibl[y a] burn," such as a cigarette burn.  <u>Id.</u> at 17.  Petitioner, thus, is challenging the trial court's admission of the report, seemingly asserting a Confrontation Clause challenge.  <u>See id.</u> at 18.

The facts of Petitioner's trial differ from what Petitioner asserted.

One of the State's expert witnesses was Dr. Charles Wetli, a renown clinical pathologist.  <u>See</u> Docket Entry No. 8-6, at 88.  Dr. Wetli, who testified that the "burn mark" on Jodi's face was "most consistent with something like a cigarette burn," <u>id.</u> at 87, was vigorously cross-examined by Petitioner's counsel.  <u>See id.</u> at 87-91.  In addition, Petitioner's counsel offered the testimony of Dr. Wolf, the defense's expert, who – at trial – opined that the mark was not a result of a cigarette burn.  Correspondingly,

> [the prosecutor cross-examined Dr. Wolf.]  The prosecutor's line of inquiry was directed at impeaching Dr. Wolf's credibility on the ground that neither of her first two expert reports contested the [State's experts'] conclusion [that the particular] injury on [Jodi's] face was a cigarette burn.  [During that line of cross-examination, the prosecutor mentioned the] content of Dr. Becker's report [even though Dr. Becker did not testify andhis report was not admitted into evidence: the prosecutor mention the report] because it, along with the reports of Drs. Oliver and Wetli [who were the State's experts witnesses testifying in open court about the cigarette burn], provided Dr. Wolf with early notice that the cause of the burn injury was at issue, [and] yet Dr. Wolf did not, for over two years [preceding the trial], contest [Drs. Wetli, Oliver and Becker's] findings [about the nature of the burn mark or the origin of the injury].  The prosecutor's [reference to Dr. Becker's report was solely for the purposes of impeachment, since – during his summation – the prosecutor stated], "Dr. Wolf avoided the issue [for] a couple of years [not contesting the] cigarette burn.  She had the original report from Dr. Becker [right from the beginning and knew of Dr. Becker's position that the particular mark on Jodi's face was] consistent with the cigarette [burn, and Dr. Wolf also] had other [State's experts'] reports." . . . . Because the content of Dr. Becker's report was not introduced for its truth but rather to show Dr. Wolf was aware of its content but did not timely contest it, it was not hearsay, and Petitioner's confrontation rights were not violated by the reference made to it at petitioner's trial.

Docket Entry No. 8-10, at 30-31 (Law Division's Opinion on PCR).

"[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  The admissibility of evidence is generally a question of state law which is not cognizable under habeas review, see Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978), unless the error in evidential ruling is so egregious that it raises a concern of constitutional magnitude.  An erroneous admission of testimonial hearsay in violation of the Confrontation Clause is "simply an error in the trial process itself" and cannot raise a concern of constitutional magnitude if the error is harmless.  Accord United States v. Hinton, 423 F.3d 355, 361-62 (3d Cir. 2005) (applying harmless error analysis to a Confrontation Clause challenge); see also United States v. Lore, 430 F.3d 190, 209 (3d Cir. 2005).  An evidentiary error is harmless if it is "highly probable that the improperly admitted evidence did not contribute to the jury's judgment of conviction."  United States v. Lopez, 340 F.3d 169, 177 (3d Cir. 2003) (internal quotation and marks omitted).  The Supreme Court has directed the courts to consider numerous factors in assessing whether the erroneous admission of testimonial evidence in violation of the Confrontation Clause was harmless to the defendant, including the importance of the testimony to the prosecutor's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case, and the strength of the prosecutor's case as a whole.  See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

Here, the Court agrees with the state courts that the reference to Dr. Becker's report was not a hearsay, since that reference was made for impeachment purposes only rather than to

introduce the report for the truth of the matter.[19]  See <u>Williams v. Illinois</u>, 132 S. Ct. 2221

(2012).[20]

     And, if any error in the trial court's evidential ruling could, hypothetically, be fathomed,

that error was harmless.  The body of evidence against Petitioner was as damning as it was

massive.  Petitioner maintains that Dr. Becker's reference to a cigarette burn tilted the scale in

favor of purposeful murder rather than swift passion/provocation manslaughter that took place

within thirty seconds.  However, had no reference to Dr. Becker's report been made, the outcome

of Petitioner's trial would still be the same: the opinions of Drs. Wetli and Oliver, as well as the

striking mass, variety and severity of Jodi's injuries, her prolonged liver and brain hemorrhages,

her thoroughly mutilated body, her odd behavior during the last two days of her life, etc. spoke

volumes to the jurors.  Petitioner was convicted of murder not because Dr. Becker's report found

a cigarette burn: he was convicted because the evidence against Petitioner was overwhelming.

     Thus, the state court's dismissal Petitioner's challenges based on the trial court's

allowance of prosecutorial reference to Dr. Becker's report was not an unreasonable application

of Supreme Court precedent.

---

    [19]  <u>See</u> Docket Entry No. 10-15 (reflecting: (a) in-court testimonies by Drs. Wetli and
Oliver; (b) admission of Dr. Wetli's report into evidence; and (c) no admission of Dr. Becker's
report into evidence).

    [20]  The plurality opinion in <u>Williams</u>, authored by Justice Alito, concluded that a expert
report did not violate the defendant's confrontation rights because, <u>inter</u> <u>alia</u>, it was admitted not
for its truth but only for the limited purpose of explaining the basis of the expert's independent
conclusion.  In a separate concurring opinion, Justice Thomas agreed with the plurality's
conclusion but for a completely different reason: because the report on which testifying expert
relied "lack[ed] the solemnity of an affidavit or deposition" and was therefore not "testimonial."

**VI.  CERTIFICATE OF APPEALABILITY**

      The Court denies a certificate of appealability because Petitioner has not made "a

substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  <u>See</u>

<u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).

**VI.  CONCLUSION**

      Based on the foregoing, the Court dismisses the Petition with prejudice and declines to

issue a certificate of appealability under 28 U.S.C. § 2253(c).


                           s/Peter G. Sheridan_____
                           **PETER G. SHERIDAN, U.S.D.J.**


Dated:  April 5, 2013